**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **WILLIAM E. SMITH, on behalf of himself** | ) | |
| **and all others similarly situated,** | ) | |
| | ) | **2:07-cv-681** |
| **Plaintiff,** | ) | |
| **v.** | ) | |
| | ) | |
| **LIFE INVESTORS INSURANCE** | ) | |
| **COMPANY OF AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |

**MEMORANDUM ORDER**

Pending before the Court is PLAINTIFF'S MOTION FOR PARTIAL SUMMARY

JUDGMENT (Document No. 193). The matter has been thoroughly briefed (Document Nos.

194, 202, 214, 227, 246, 292, 293) and in addition, the parties have comprehensively developed

their respective positions as to the Concise Statement of Material Facts (Document Nos. 195,

196, 215, 216, 228, 229, 231). The motion is ripe for disposition.


Factual and Procedural Background

This case has a tortuous procedural history which need not be recounted in full.[1] It is

important to recognize that the instant motion seeks only a narrow determination. Specifically,

Plaintiff seeks summary judgment on Counts 1 and 3 of the Second Amended Complaint and

asks the Court to declare that: (1) Plaintiff's interpretation of the term "actual charges," as used

in the policies issued or administered by Defendant in Pennsylvania, is reasonable, and that the

---

[1]The motion for class certification has been addressed in a separate opinion which will be
issued contemporaneously.

term is at least ambiguous; and (2) Defendant breached and continues to breach the policies at issue. These are legal questions for the Court which are well-suited to summary judgment.

Defendant Life Investors Insurance Company of America ("Life Investors") is a corporation organized under the laws of Iowa and with a principal place of business in Iowa. Bankers United Life Assurance Company ("Bankers Life") merged into Life Investors on December 31, 2001. Effective October 2, 2008, after this litigation was filed, Life Investors merged into Transamerica Life Insurance Company ("Transamerica"). For convenience and consistency, Defendant will be referred to as "Life Investors."

Life Investors sold policy form LPC01PA and substantially identical Bankers Life policy form BPC01PA supplemental cancer-only insurance policies in Pennsylvania between 1996 and 2002. Policy forms LPC01PA and BPC01PA will be referred to collectively as "the Policy." Because the Policy provides "supplemental" insurance, it pays cash benefits directly to the insured, irrespective of whether the insured's medical expenses are paid by other insurance. The insured is free to use the cash benefits for any purpose, such as to defray the indirect expenses associated with a major illness. The Policy provides approximately 24 different categories of benefits. Some benefits are expressed as fixed dollar amounts, other benefits have yearly maximums, some are unlimited and some are based on usual and customary charges. At issue in this litigation are the benefits which are based on "actual charges" for the services provided, including chemotherapy, radiation therapy, blood benefits, and ambulance services. The term "actual charges" is not defined in the Policy.

Plaintiff Frances Smith is a 67-year-old Pennsylvania resident who purchased a supplemental cancer insurance policy written on Life Investors policy form LPC01PA, with an

2

effective date of October 17, 1998.  Her husband, William E. Smith, was also a "covered person" under the policy.[2]  Ms. Smith purchased the Policy through her daughter, Mary Pennington, who worked as an insurance agent for Life Investors. Ms. Smith chose a $5000 deductible and an unlimited yearly benefit for chemotherapy, radiation and blood benefits.  Mr. Smith was diagnosed with cancer in November 2005 and began receiving chemotherapy treatments from the University of Pittsburgh Cancer Institute ("UPCI") beginning in December 2005 and he died on December 24, 2008.  Prior to April 1, 2006, Life Investors paid benefits on the full amount billed by UPCI for Mr. Smith's chemotherapy treatments as set forth on the Explanation of Benefits forms ("EOB forms") sent by Life Investors to Ms. Smith, rather than the discounted amounts that UPCI accepted as payment.

Life Investors began issuing supplemental insurance policies that covered "actual charges" in the 1970s.  On November 11, 1997, Jim Brandon, Vice President of Claims for Life Investors, sent a memo to claims examiners and supervisors regarding "Actual Charges Versus Discounted Charges."  The memo instructed Life Investors claims personnel:

> Several benefits in our policies state we will pay actual charges.  This term is not defined in the policy.  For claims processing purposes, use the actual charge billed by the provider, not the  discounted amounts.  While predominantly occurring on prescription drugs, if seen elsewhere, pay the actual charges (including taxes) and not the reduced amounts. . . .

 A similar instruction was provided in an April 16, 2003 memorandum from Carol Rutledge, Quality Assurance Coordinator for Life Investors.  At no time prior to April 2006 did Life Investors require insureds to submit the amounts the medical providers had accepted as payment

---

[2]Mr. Smith was also covered by Medicare and a Highmark Security Blue Medicare Advantage HMO health plan.

for their services in support of their claims.

On January 12, 2006, Life Investors sent a letter to its Pennsylvania policyholders to announce its changed procedures regarding "actual charges" claims.[3]  The letter explained that information statements from medical providers to patients that contain "list" prices are not true "bills" and do not reflect the actual amounts accepted as payment by the medical providers. Accordingly, Life Investors stated that effective April 1, 2006, policyholders would be required to submit as proof of loss "documentation which shows the amount of the actual charges being paid to and accepted by the healthcare provider as payment in full for the medical services rendered."  Mr. Smith continued to receive chemotherapy treatments after April 1, 2006, but Life Investors paid as benefits only the discounted amounts accepted as payment by UPCI rather than the full amounts billed by UPCI to the Smiths.  The monetary difference between the parties' proposed interpretations of "actual charges" in excess of $275,000.[4]

Numerous lawsuits throughout the country have raised similar issues regarding the interpretation of the term "actual charges" in supplemental insurance policies.  The vast majority of the cases have concluded that the term "actual charges" is ambiguous.  *See Pierce v. Central United Life Ins. Co.*, 2009 WL 2132690 (D. Ariz. 2009); *Lindley v. Life Investors Ins. Co. of America*, 2009 WL 2163513 (N.D. Okla. 2009); *Guidry v. American Public Life Ins. Co.*, 512 F.3d 177 (5th Cir.2007); *Ward v. Dixie Nat'l Life Ins. Co.*, 257 Fed. Appx. 620 (4th Cir. Nov. 29,

---

[3]Defendant prefers to say that it "corrected its procedures" rather than "changed its interpretation."  The semantics are irrelevant.  It is undisputed that the benefits which Life Investors provided to Plaintiff for Mr. Smith's chemotherapy treatments changed after April 1, 2006.

[4]Life Investors calculates the amount to be $276,167.06, while Plaintiff's expert reaches the slightly higher figure of $279,098.95.

2007); *Hodges v. American Fidelity Assur. Co.*, 2008 WL 723994 (S.D. Miss. Mar. 17, 2008); *Conner v. American Public Life Ins. Co.*, 448 F. Supp.2d 762 (N.D. Miss. 2006); *Metzger v. American Fidelity Assurance Co.*, 2006 WL 2792435 (W.D. Okla. Sep. 26, 2006).  However, two cases have held that "actual charges" unambiguously means the amount accepted by the plaintiff's medical provider as full payment pursuant to an agreement with a group health insurer. *See Claybrook v. Central United Life Ins. Co.*, 387 F. Supp.2d. 1199 (M.D. Ala.2005); *Jarreau v. Central United Ins. Co.*, 2006 WL 2086011, * 1 (M.D. La.2006) (questioned by *Guidry*, 512 F.3d at 182, and *Ward*, 257 Fed. Appx. at 630). *See also Ward v. Dixie Nat'l Life Ins. Co.*, 2006 WL 1529398 (D.S.C. 2006), *reversed and vacated* 257 Fed. Appx. 620 (4th Cir. 2007).  In *Philadelphia American Life Ins. Co. v. Charles Buckles*, 2009 WL 3403281 (11th Cir. Oct. 23, 2009), the district court had concluded that "actual charges" unambiguously meant "the amount billed by the provider, and that 'actual charges incurred' is the reduced amount that the hospital accepts from an insurance company as full payment."  *Id.* at *1.  The Court of Appeals rejected the policyholder's argument that the terms "actual charges" and "actual charges incurred" were synonymous and affirmed the district court's interpretation of "actual charges incurred."

Standard of Review

Rule 56(c) of the Federal Rules of Civil Procedure reads, in pertinent part, as follows:

[Summary Judgment] shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

In interpreting Rule 56(c), the United States Supreme Court has stated:

> The plain language . . . mandates entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

An issue of material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The court must view the facts in a light most favorable to the non-moving party, and the burden of establishing that no genuine issue of material fact exists rests with the movant.  *Celotex*, 477 U.S. at 323.

Legal Analysis

In this diversity case, the Court will evaluate the substantive issues in accordance with Pennsylvania law.[5]  *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78-80 (1938).   There are two fundamental principles regarding the interpretation of insurance contracts under Pennsylvania law that govern this case.  First, contractual interpretation is determined by the court.   "A question regarding the interpretation of an insurance contract is a matter of law for the courts to decide."  *Weisman v. The Green Tree Insurance Company*, 670 A.2d 160, 161 (Pa. Super. 1996).  In *Prudential Property and Casualty Insurance Company v. Sartno*, 903 A.2d 1170, 1175 (Pa. 2006), the Pennsylvania Supreme Court stated that "[t]he interpretation of an insurance contract

---

[5]  A federal court sitting in diversity must apply the substantive law as decided by the state's highest court.  *Travelers Indem. Co. of Illinois v. DiBartolo*, 131 F.3d 343, 348 (3d Cir. 1997) (citation omitted).

6

regarding the existence or non-existence of coverage is generally performed by the court." The Court's  task is to ascertain the intent of the parties as manifested in the language of the written instrument. *Standard Venetian Blind Co. v. American Empire Insurance Company*, 469 A.2d 563, 566 (Pa. 1983).

The second fundamental principal is that ambiguous terms in an insurance contract must be construed in favor of the policyholder and against the insurance company. "Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer.... Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language." *Minnesota Fire & Casualty Company v. Greenfield*, 855 A.2d 854, 861 (Pa. 2004) (citations omitted); *Accord Lexington Insurance Company v. Western Pennsylvania Hospital*, 423 F.3d 318, 323 (3d Cir. 2005) ("Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement."). In *Prudential Property*, 903 A.2d at 1175, the Court explained:

> The instant matter is a prime example of language in a policy that can be understood in more than [one] way. Sartno prefers one interpretation; Prudential favors the other. Regardless of which one is "right" or "wrong," the fact is that because each interpretation is reasonable, the exclusionary term is ambiguous, and we must construe it in favor of the insured. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement. The insurance company is the drafter of the terms of the policies it issues to its insureds, and, being the one who selects the language in the contract, must be specific in its use; an exclusion from liability must be clear and exact in order to be given effect.

*Id.* at 1177 (internal quotation marks and citations omitted).

To reiterate, ambiguities in insurance contracts are treated differently under Pennsylvania

7

law than those in other contracts.  In *Madison Construction Company v. The Harleysville Mutual Insurance Company*, 735 A.2d 100 (Pa. 1999), the Supreme Court of Pennsylvania summarized the construction of insurance contracts under Pennsylvania law:

> The task of interpreting an insurance contract is generally performed by a court rather than by a jury.  The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument.  Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the insured and against the insurer, the drafter of the agreement.  Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language.  Contractual language is ambiguous if it is reasonably susceptible of different constructions and capable of being understood in more than one sense.  This is not a question to be resolved in a vacuum.  Rather, contractual terms are ambiguous if they are subject to more than one reasonable interpretation when applied to a particular set of facts.  We will not, however, distort the meaning of the language or resort to a strained contrivance in order to find an ambiguity.

*Id.* at 106 (citations, brackets and internal quotation marks omitted).  "This rule of strict construction against the insurer is especially true should the ambiguity exist as an exception to general liability."  *Canal Insurance Company v. Underwriters at Lloyd's London*, 435 F.3d 431, 435 (3d Cir. 2006).


A.    Policy Language

The Court turns first to the language of the Policy.  Plaintiff contends that the term "actual charges" means "the amounts charged by healthcare providers for the performance of services, treatments and procedures before any insurance discount or reduction, rather than the amounts the providers were paid by or would accept as full payment from third-party payors."  Defendant contends that "actual charges" is not a single term but should be broken into its components, and that "actual" and "charges" are words of common usage.  Defendant, in

8

essence, argues that "actual" means "real" and that "charge" means "pecuniary liability" such that the term "actual charges" means "real liabilities."  Defendant then argues that list prices set forth on statements prepared by medical providers are arbitrary, inflated and fictitious and therefore cannot constitute "actual charges."

After a thorough review of the Policy language and consideration of the parties' respective arguments, the Court concludes that the term "actual charges" is, at a minimum, ambiguous.  The term can reasonably be construed to mean: (1) the amount set forth on the statement sent by the medical provider to the patient; or (2) the amount accepted as payment by the medical provider from a third party.  The reasoning set forth by the majority of the prior cases to have considered this issue is by far the more compelling and Defendant's attempts to distinguish these cases are entirely unpersuasive.  As explained in *Ward*, 257 Fed. Appx. at 625, the term "actual charges" can reasonably "be understood to mean the amount shown on the bill sent to the patient regardless of whether this amount is the same as the amount actually owed."

It would have been simple for Life Investors to avoid this ambiguity by defining the term "actual charges."  For example, certain provisions in the Policy provide for reimbursement of "Usual and Customary charges" for activities such as surgery, biopsies and experimental treatments.  The term "Usual and Customary charges" *is* defined in the Policy and means the "normal and reasonable charge for a service, an apparatus, or medicine in the geographic area where provided."  The failure to provide a similar definition for "actual charges" is glaring.  The Policy clearly treats coverage for "actual charges" as distinct and different from coverage for "Usual and Customary charges."  However, Life Investors, in essence, asks the Court to treat the terms as synonymous.  If Life Investors had intended to limit its coverage to the amount that

9

medical providers usually and customarily charge or the amount they usually and customarily accept as payment from Medicare or other third-party payors, it knew how to draft such a provision.  It failed to do so.

Defendant further argues that Plaintiff's proposed interpretation is inconsistent with the "loss incurred" clause in § C of the Policy which states, in relevant part: "Benefit payments will be made directly to the Insured. . . for losses incurred by any Covered Person under this policy. Proof of loss must be submitted for each incurred expense."  Defendant points to other provisions in the Policy in which "actual charges" are listed as a type of "expense incurred" and the term "actual round trip charge" is listed as a "transportation expense."  In sum, Defendant argues that these terms connote that the policyholder must have a legal obligation to pay.  The Court is not persuaded.  Policy § C(1)(b) defines the term "loss is incurred" to mean "(e.g., treatment is received or the service is performed)."  The items listed on a medical statement are "losses incurred" because they represent treatments which have been received by or services that have been performed on the patient.  The medical provider statements constitute "proof of loss."[6] In sum, the provisions referenced by Defendant do not render Plaintiff's proposed interpretation unreasonable.

The Court disagrees with Life Investors' assertion that the amounts set forth on statements sent to patients are entirely fictitious.  Defendant concedes that medical providers have, in fact, created "list" or "chargemaster" price lists and that some small percentage of customers pay these prices.  *See Pierce*, 2009 WL 2132690 * 7.  Even if medical providers

---

[6]In Policy ¶ 16 (Bone Marrow Donor's Expenses), the term "actual charges" is treated as distinct and different from the term "actual expenses."  *Compare* ¶ 16(a), (c) *with* ¶ 16(b).

routinely accept discounted payments from third-party payors, these "list" prices indisputably exist (i.e., they are "actual").  Further, the itemized procedures that are placed on such statements represent services that were in fact provided to that patient (i.e., they are "losses incurred").

Moreover, Plaintiff will not obtain an improper "windfall" recovery.  As supplemental insurance, the Policy is not designed to reimburse a policyholder for the exact amount of his/her out-of-pocket expenditures, but rather, the Policy "pays cash benefits directly to the insured, irrespective of whether the insured's medical expenses are paid by other insurance."  *See Guidry*, 512 F.3d at 182 n.6 ("the payment of benefits exceeding actual expenses does not lead to an unreasonable result.");  *Pierce*, 2009 WL 2132690 * 7.   The contract entered into between Smith and Life Investors has little to do with the separate negotiations between healthcare providers and third-party payors.  *See Lindley*, 2009 WL 2163513 *6.  Thus, under Pennsylvania law, the term "actual charges" is ambiguous and must be construed in favor of Plaintiff and against Life Investors.

Defendant's reliance on *Moorhead v. Crozer Chester Medical Center*, 765 A.2d 786, 790 (Pa. 2001), is unavailing because that case involved the far different issue of the measure of tort damages and has almost no relevance to the construction of a term in an insurance policy.  The existence of statutes in states other than Pennsylvania which define "actual charges" is similarly unavailing.  If anything, the existence of such statutes indicates that the legislatures in those states concluded that the term was sufficiently ambiguous that legislation was necessary to clarify its meaning.  Indeed, consideration of the entire record convinces the Court that Plaintiff's proposed interpretation of the term "actual charges" is at least as plausible as Defendant's proposed interpretation.

B.      Trade Usage and Course of Performance

Defendant argues vigorously that the Court should not consider evidence of trade usage (in the form of the definition of "actual charges" by Medicare and medical dictionaries) or course of performance.  As an initial matter, consideration of "trade usage" and "course of performance" evidence is not necessary to rule in favor of Plaintiff.  Plaintiff has introduced this evidence merely to demonstrate that her proposed definition is objectively reasonable – i.e., sufficient to create an ambiguity.   The language of the Policy is ambiguous, and the Court could rest its decision on that basis.  Examination of trade usage and course of performance evidence could only benefit ***Defendant*** by enabling Life Investors to overcome the apparent ambiguity in the text of the Policy.

In any event, consideration of such evidence is entirely appropriate.  In *AstenJohnson, Inc. v. Columbia Cas. Co.*, 562 F.3d 213, 220 (3d Cir. 2009) (citations omitted), the Court of Appeals affirmed the district court's consideration of medical dictionaries and course of performance in interpreting an insurance contract:

> Pennsylvania law follows the Restatement approach to the interpretation of written, integrated contracts. Parol evidence cannot be used to contradict the provisions of such a contract. In determining whether such a contradiction would occur, however, the text of the contract must first be interpreted in light of any evidence of trade usage and the performance of the parties under the contract. If after the consideration of such evidence, the intent of the parties remains unclear, evidence concerning the pre-contract negotiations of the parties may also be considered in reaching a conclusion concerning the intention of the parties.

Indeed, "course of performance" it is entitled to great weight.  *Tindall v. Friedman*, 970 A.2d 1159, 1166 (Pa. Super. 2009).  It is a general rule of contract interpretation that the intention of the parties at the time the contract is entered into governs, *Heidt v. Aughenbaugh Coal Co.*, 176

A.2d 400 (Pa. 1962), and the manner in which Life Investors interpreted and administered "actual charges" prior to 2006 is certainly indicative of the intention of the parties in 1998 when Smith purchased the Policy.

Upon examination, Plaintiff's proposed interpretation is not inconsistent with the usage in the industry.    The Center for Medicare and Medicaid Services defines "actual charge" to mean: "The amount of money a doctor or supplier charges for a certain medical service or supply.  This amount is often more than the amount Medicare approves."  The McGraw-Hill Essential Dictionary of Health Care (1988) defines "actual charge" as "the amount a physician or other practitioner actually *bills* a patient for his insurance for a medical *service* or *procedure*.  The actual charge may differ from the customary, *prevailing*, and/or *reasonable charges* under *Medicare* and other insurance programs."  (Emphasis in original).  *See also* Mosby's Medical, Nursing & Allied Health Dictionary (4th ed. 1994 amd 6th ed. 2002) (explaining that "actual charge" may not be "the same as that paid for the service by an insurance plan.")    Plaintiff has cited several other industry sources which make a similar distinction between "actual charges" and the discounted amount actually paid or accepted.  *See Pierce*, 2009 WL 2132690 *5.  Indeed, Defendant's own policies in Oklahoma define "actual charges" as suggested by Plaintiff.  At a minimum, trade usage fails to confirm that Defendant's proposed interpretation is the only one that is reasonable.

Similarly, a review of the evidence regarding "course of performance" fails to demonstrate that Defendant's proposed interpretation is unambiguously correct.  To the contrary, Defendant engaged in a long-term practice of interpreting "actual charges" to relate to "the actual charge billed by the provider, not the discounted amounts."  *See* Memorandum from Jim

13

Brandon to Claims Examiners dated November 11, 1997 (emphasis added):

> **Several benefits** in our policies state we will pay actual charges.  This term is not
> defined in the policy.  For claims processing purposes, **use the actual charge
> billed by the provider, not the  discounted amounts**.  While **predominantly**
> occurring on prescription drugs, **if seen elsewhere**, pay the actual charges
> (including taxes) and not the reduced amounts. . . .

Defendant's argument that this memo applies only to prescription drugs begs credulity, given the
plain text emphasized above.  The Brandon Memo was reaffirmed in the Rutledge Memo dated
April 16, 2003.  Similarly, Life Investors explained to the Oklahoma insurance regulators that
"actual charges" meant the amount billed for treatment before any insurance discounts. Memo
from Sandra L. D'Orazio, Assistant Vice President-Compliance Officer dated November 10,
1997 ("It is the company's practice to pay the actual charge billed to the insured for those items
identified in the policy as being covered for actual charges.  We do not pursue information
regarding discounts when determining benefits.")  Indeed, Life Investors paid the Smiths'
December 2005 claim in accordance with the "list" prices provided by UPCI.

Defendant excuses its failure to investigate "actual charges" payments prior to 2004
because the difference between list prices and net prices was small and went largely unnoticed in
the health care financing community.  Document No. 214 at 12 n.10.  For the same reasons, it is
unlikely that policyholders such as Ms. Smith would have anticipated that their benefits would be
based on anything other than the prices set forth on the statements they received.  To put it
another way, Life Investors has failed to demonstrate that the Policy unambiguously allocated the
risks associated with evolving medical industry billing practices to policyholders.

 Even assuming that Life Investors' long-term practice of "pay[ing] the actual charges
(including taxes) and not the reduced amounts ....", was merely a "good faith gesture," Defendant

14

has fallen far short of meeting its burden to convince the Court that its proposed interpretation is unambiguously correct.  Defendant's reliance on *Riethman v. Berry*, 287 F.3d 274, 277 (3d Cir. 2002), is misplaced because Life Investors' course of performance does not conflict with the plain meaning of the Policy.  Indeed, Life Investors' own actions confirm that Plaintiff's proposed interpretation of "actual charges" is reasonable.  Because the term "actual charges" is, at a minimum, ambiguous, it will be construed in favor of the policyholders and against Life Investors.

In accordance with the foregoing, PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Document No. 193) is **GRANTED**.

SO ORDERED this 6th  day of November, 2009.

BY THE COURT:

s/  Terrence F. McVerry
United States District Court Judge

cc:   Ellen M. Doyle, Esquire
        Email: edoyle@stemberfeinstein.com

        Colin E. Wrabley, Esquire
        Email: cwrabley@reedsmith.com
        Perry A. Napolitano, Esquire
        Email: pnapolitano@reedsmith.com
        Markham R. Leventhal, Esquire
        Email: ml@jordenusa.com
        Julianna Thomas McCabe, Esquire
        Email: jt@jordenusa.com

15